

**SO ORDERED.**

**SIGNED this 24 day of May, 2011.**

*Stephani W. Humrickhouse*
**Stephani W. Humrickhouse**
**United States Bankruptcy Judge**

_____

### UNITED STATES BANKRUPTCY COURT
### EASTERN DISTRICT OF NORTH CAROLINA
### RALEIGH DIVISION

| | |
|---|---|
| **IN RE:** | **CASE NO.** |
| **RICKY V. MURRAY and** | **10-10143-8-SWH** |
| **CONNIE B. MURRAY,** | |
| **DEBTORS** | |

### ORDER ALLOWING DEBTORS' MOTION FOR USE OF CASH COLLATERAL AND ALLOWING BB&T'S REQUEST FOR ADEQUATE PROTECTION

Pending before the court is the debtors' motion for authorization to use cash collateral pursuant to 11 U.S.C. § 363. An objection was filed by creditor Branch Banking & Trust Co. ("BB&T"), and an interim order allowing the debtors' use of cash collateral subject to limitations agreed to by the parties was entered on January 3, 2010. That order expired, and was supplemented by a second interim order authorizing use of cash collateral, which expired on January 25, 2011.

A brief hearing was held on January 7, followed by a more substantive hearing on January 25, 2011, in Raleigh, North Carolina. The primary issue remaining for final disposition, which was specifically excluded from both interim orders, is whether rents received from BB&T's collateral are property of the estate and constitute "cash collateral" as that term is used in § 363. If the court answers that question in the affirmative, the related issue is whether the debtors have the

authority to use cash collateral for maintenance and operational expenses and, if so, in what amount. For the reasons that follow, the court will allow the debtors' motion to use cash collateral and will approve the adequate protection payments offered by the debtors to BB&T.

## FACTS AND BACKGROUND

The debtors are members and principals of three North Carolina limited liability companies engaged in the business of owning and renting real estate, and a corporation known as Lisa Dee's Florist, Inc. (collectively, the "Related Entities"). Two of the LLCs were administratively dissolved by the North Carolina Secretary of State in February 2009.

Beginning in 2004 and continuing with additional transactions in 2006 and 2008, the debtors and Related Entities entered into loan agreements with BB&T wherein the debtors and Related Entities executed promissory notes and guaranty agreements in favor of BB&T. The transactions included execution of deeds of trust, security agreements, and assignments of rents which granted to BB&T a security interest in real property owned by the Related Entities as well as rents issuing from those properties. The debtors and Related Entities defaulted on their loan obligations, and in September 2010, BB&T initiated foreclosure proceedings. BB&T also exercised its right to receive rents directly from tenants of the properties by sending formal notices of demand to the tenants in November 2010. There was no evidence at the hearing that BB&T actually received any rents directly from tenants.

On December 1, 2010, the day of the foreclosure sale, the Related Entities transferred to the debtors all of the Related Entities' interests in the real property subject to BB&T's security interests. The properties were transferred for nominal consideration. The debtors filed a petition under chapter 11 on December 10, 2010. The debtors contend that the value of BB&T's collateral is

maximized if they continue in their businesses ventures, but continuation of the businesses will cause the debtors to incur maintenance and operating expenses. Without the rent derived from the properties, the debtors argue, their limited income from other sources (the female debtor's employment and the male debtor's operation of a florist shop) will not provide sufficient cash flow to allow them to continue business operations. Accordingly, the debtors moved for authority to use cash collateral – *i.e.*, the rents – to pay for operational and other expenses, including management fees to the debtors, insurance, supplies, utilities, and taxes.

BB&T objected to the motion to use cash collateral on several grounds. Its main argument is that due to the assignments of rents and BB&T's actions to take possession of them, the rents are not property of the estate. Further, BB&T claims, the transfers of property from the Related Entities to the debtors were inconsistent with North Carolina state law and potentially fraudulent, and also *ultra vires*, given that at least two of the transferors had been administratively dissolved prior to the transfers. Finally, BB&T argues that the debtors' real property is undersecured and BB&T thus lacks adequate protection.

At the January 25, 2011 hearing, the debtors proposed to make initial adequate protection payments of $8,008.39 per month ($2,000 in connection with a Castlebrook property which currently is rented and a $6,008.39 partial interest component). The debtors indicated that future property rentals could increase the amounts available for adequate protection. The debtors have not yet made those proposed payments to BB&T, pending approval of those amounts by the court.

BB&T filed a motion for relief from stay or in the alternative for adequate protection on March 15, 2011, to which the debtors filed a response in opposition. That matter is scheduled to be heard on June 8, 2011. During a telephonic status conference held on April 5, 2011, the parties

informed the court that they had been proceeding consistent with the terms of the second interim order despite its expiration. On May 1, 2011, BB&T filed an adversary proceeding against the debtors and Related Entities in which it asserts claims arising out of the Related Entities' transfers of the properties to the debtors.

## DISCUSSION

There are several issues subsumed within or related to the larger cash collateral questions, and the court will address each in turn. First on the horizon: Are the rents property of the estate?

The Bankruptcy Code defines property of the estate broadly to include "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). Applicable non-bankruptcy law determines whether a debtor holds a legal or equitable interest in property. Butner v. U.S., 440 U.S. 48 (1979). Then, federal law determines whether that interest in property constitutes property of the estate. In re Bryn Athyn Investors, 69 B.R. 452, 456 (Bankr. E.D.N.C. 1987).

BB&T argues that the assignments of rents executed in connection with the deeds of trust and security agreements constitute absolute assignments under North Carolina state law, such that the rents were the property of BB&T before the chapter 11 petition was filed. According to BB&T, the Related Entities, having already recorded the assignment of rents to BB&T, had no ability to transfer the rents to the debtors. BB&T Mem. of Law in Support of BB&T's Objection to Debtors' Emerg. Mot. for Auth. to Use Cash Collateral at 3 ("BB&T Mem. of Law"). The court disagrees. The assignment of rents and profits consists of a paragraph included in each separate Deed of Trust and Security Agreement, and provides as follows:

> 9. RENTS AND PROFITS. Grantor hereby assigns to Beneficiary all future rents and profits from the Property *as additional security for the payment of the Debt and*

4

> *for the performance of all obligations secured by this Deed of Trust*. Grantor hereby appoints Beneficiary as Grantor's attorney-in-fact to collect any rents and profits, with or without suit, and to apply the same, less expenses of collection, to the Debt or to any obligations secured by this Deed of Trust in any manner as Beneficiary may desire. However, until default under the Note or other Document or under this Deed of Trust, Grantor may continue to collect and retain the rents and profits without any accountability to Beneficiary. Beneficiary's *election to pursue the collection of the rents or profits shall be in addition to all other remedies* which Beneficiary might have and may be put into effect independently of or concurrently with any other remedy.

BB&T's Obj. to Debtor's Emerg. Mot., Ex. V. at p. 3 ¶ 9 (emphasis added).

The other 13 deeds of trust and security agreements include language that is either identical to the language just quoted, or substantially so. See id. Exs. W - Z & AA - II. It is patently clear from the language of these provisions that the assignment is not absolute. Assignments of rent often do include specific references to "absolute" assignments in hopes of establishing the assignment as "absolute," even though the assignment is "in reality an assignment meant to secure the underlying obligation to [the mortgagor]." In re Harvest Oaks Drive Assocs., LLC, Case No. 10-03145-8-SWH at 14 (Bankr. E.D.N.C. March 23, 2011) (quoting In re Senior Hous. Altvs., Inc., 444 B.R.386, 397 (Bankr. E.D. Tenn. 2011). In this case, refreshingly, the assignment purports to be only what it is: "additional security for the payment of the debt." It is a collateral assignment within the meaning of N.C. Gen. Stat. § 47-20(b)(3), which provides:

> "Collateral assignment" means any assignment of leases, rents, issues, or profits made and delivered in connection with the grant of any mortgage, or the execution of any conditional sales contract or deed of trust or in connection with any extension of credit made against the security of any interest in real property, where the assignor retains the right to collect or to apply such lease revenues, rents, issue or profits after assignment and prior to default.

This contractual, collateral assignment of rents in no way precludes the rents from being property of the estate.

BB&T contends, however, that state law does. In BB&T's view, the plain language of the parties' agreement is enhanced in effect by N.C. Gen. Stat. § 47-20, because that statute enables a mortgagee to enforce its possessory rights by collecting and receiving rents without appointing a receiver. Section 47-20(d) provides:

> Where an assignment of leases, rents, issues or profits is a collateral assignment, after a default . . . the assignee shall thereafter be entitled, but not required, to collect and receive any accrued and unpaid or subsequently accruing lease revenues, rents, issues, or profits subject to the assignment, without need for the appointment of a receiver, any act to take possession of the property, or any further demand on the assignor. Unless otherwise agreed, after default the assignee shall be entitled to notify the tenant or other obligor to make payment to him and shall also be entitled to take control of any proceeds to which he may be entitled. The assignee must proceed in a commercially reasonable manner and may deduct his reasonable expenses of realization from the collections.

BB&T argues that the language of the statute can be read to "make[] clear that upon default, the Related Entities completed an absolute assignment of the right to rents from the pledged properties in favor of BB&T." BB&T Mem. of Law at 5. "Upon default," BB&T argues, its "absolute right to the rental proceeds from the pledged properties immediately self-executed, and the Related Entities' interest in the rents automatically extinguished."

According to BB&T, the Related Entities transferred ownership of the properties to the debtors, but not ownership of the rents:

> The Related Entities transferred the subject properties to the Debtors after their default under their obligations to BB&T. The transfer occurred after BB&T obtained absolute ownership rights to the rents and all rights held by the Related Entities were extinguished. Since the Related Entities had no rights to rents from the subject properties at the time they transferred the properties to the Debtors, the Debtors took the subject properties without any rights to the rents. Thus, the Debtors took the subject properties . . . subject to B&T's rights to collect rents. The rents cannot be property of the estate because, by virtue of the Related Entities' assignment to BB&T, the Debtors do not hold, and never have held, any rights in the rents.

BB&T Mem. of Law at 6.

The court's reading of the deeds of trust and the statute does not reach quite so far. Until default, the Related Entities (and, of course, any assignees of the Related Entities) were entitled to use the rents as they chose. After default, BB&T was entitled, though not required, to notify tenants to make payments directly to it (which it did) and to "take control of any proceeds to which [it] may be entitled."[1] The statute operates to make it easier for the assignee of a collateral assignment to take *possession* of the rents through quick and inexpensive means, if it chooses to do so. The statute does not transfer *ownership* of the rents, which is a different animal. See Buttermilk Towne Center, LLC, 442 B.R. 558, 564 (6th Cir. BAP 2010) ("Without an absolute right of ownership, mere possession cannot divest the debtor of its ownership interest, therefore the rents are property of the estate."); In re Senior Housing Altvs., Inc., 444 B.R. 386. The rents, being property of the estate and also subject to BB&T's security interest, constitute cash collateral of the estate.

The fact of the transfer of the underlying fee does not change the analysis. BB&T argues that pursuant to the assignment of rents, which BB&T properly recorded, the Related Entities' rights to the rents were automatically extinguished upon default. Accordingly, BB&T reasons, the Related Entities' post-default transfer of the properties could not also transfer the right to rents issuing from the properties, because the Related Entities no longer held those rights. The court disagrees. The assignment of rents was not absolute, as discussed above, and did not sever the rents from the underlying collateral.

Next, BB&T contends that under North Carolina state law, the Related Entities' transfers of the properties to the debtors may constitute fraudulent transfers and that "a transfer of property that

---

[1] The parties' agreements further require that BB&T, if it chooses to collect the rents, must apply rents and profits to the debt or secured obligation, less any expenses incurred in the process of collection.

is fraudulent under state law does not constitute property of the transferee-debtor's estate."[2] BB&T's Mot. for Relief from Stay ¶ 15.  In addition, BB&T contends, some transfers are void on grounds that the transferring entity was administratively dissolved at the time of transfer.  Whether a fraudulent transfer occurred or an administratively dissolved entity may successfully effect the transfer of real property should be resolved in the context of an adversary proceeding, which BB&T recently filed.  At present, and as of the date of the petition, the property was titled in the name of the debtors and will remain so unless and until voided.

Finally, the court having concluded that the rents are property of the estate and constitute cash collateral, the issue then becomes whether the debtors may use the cash collateral, which consists almost wholly of rents, over BB&T's objection.  The debtors seek to use the rents only for operational and maintenance costs.  BB&T is undersecured and argues that it cannot be adequately protected for the debtors' use of cash collateral by the rents themselves.

BB&T's position is derived from a recent decision from the Court of Appeals for the Sixth Circuit – Buttermilk Towne Center, LLC, 442 B.R. 558, 563-65 (6th Cir. BAP 2010).  In Buttermilk, the court held that a replacement lien in rents did not provide adequate protection to the mortgagee where the debtor requested authority to use cash collateral, including the rents, to pay for "certain expenses, including attorney fees." Id. at 565.  The court outlined the issue before it in expansive terms, asking "whether a lender is adequately protected by a replacement lien on rents in which the

---

[2] The case cited by BB&T in support of this statement involved a motion to dismiss for bad faith filing.  The district court, which was affirmed by the Fourth Circuit, noted the pre-petition transfers into a brand new entity as one of many reasons for dismissal because the transferred property "probably cannot be part of the Debtor's estate." Resolution Trust Corp. v. C&R, L.C., 165 B.R. 593, 595 (W.D. Va.), aff'd, 27 F.3d 562 (4th Cir. 1994) (unpublished opinion).  The facts and procedural posture of that case were significantly different from those in the case at bar.

lender has an independent security interest?" Id. That query as framed, though, extends beyond the facts that were actually before the Buttermilk court.

In fact, the Buttermilk court emphasized that the specific issue before it had been addressed and decided by a prior, unpublished decision of the panel on substantially similar facts which also turned on the use of rents for payment of professional fees. Id. (construing In re Stearns Bldg., 165 F.3d 28, 1998 WL 661071 (6th Cir. 1998) (unpublished table decision)). In Stearns, "the debtor requested authority to use cash collateral, including the rents, to pay for administrative expenses *unrelated to the maintenance and operation of the complex*, including the fees and expenses of its lawyers and consultants involved in the bankruptcy." Id. (emphasis added). The creditors in both Buttermilk and Stearns thus disputed the use of rents for purposes beyond payment of maintenance and operational costs. 442 B.R. at 565. In that context, and consistent with the decision in Stearns, the Buttermilk court held that a debtor's offer of only a replacement lien in rents did not constitute adequate protection for the debtor's use of rents.

The Buttermilk court thus did not consider the inquiry that is before this court – *i.e.*, whether using rents solely for the maintenance and operation of the property would satisfy the adequate protection requirement – because it did not need to do so. Ironically, the issue before this court is one on which the parties in both Buttermilk and Stearns appeared to have reached consensus. It is telling that in Buttermilk, the lender maintained, and the court determined, that the debtor was required to provide adequate protection *in order to use the "net" rents* – those rents being the funds that remain *after* paying operating expenses. 442 B.R. at 565-66. The Buttermilk court permitted, without discussion, the use of cash collateral for the benefit of the real property collateral (through maintenance and operations) as if that use constituted adequate protection in and of itself. The point

at which the Buttermilk court began is where we will end. There is no need for this court to consider the broader issue analyzed in Buttermilk.

The debtors propose to make monthly adequate protection payments to BB&T and to use the rents generated by the properties *only* for maintenance and operational costs. The debtors may adequately protect BB&T by making monthly payments to BB&T from the rental proceeds of the property for the operation and maintenance expenses. BB&T did not contest the amount of the monthly payments the debtors propose to make – $8,008.39 – and, therefore, the court finds that such monthly payments shall adequately protect BB&T for the debtors' use of cash collateral.

## CONCLUSION

For the foregoing reasons, the debtors' motion to use cash collateral is **ALLOWED**. Prior to the hearing set for June 8, 2011 on BB&T's motion for relief from the stay or for adequate protection, the debtors are directed to pay to BB&T adequate protection payments of $8,008.39 per month for the months of February, March, April, May and June 2011. A determination of adequate protection payments after June 2011 will be made in conjunction with the stay hearing.

**SO ORDERED**.

**END OF DOCUMENT**