

**SO ORDERED.**

**SIGNED this 27 day of March, 2012.**

_____
**Stephani W. Humrickhouse
United States Bankruptcy Judge**

_____

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NORTH CAROLINA
RALEIGH DIVISION

| | |
|---|---|
| IN RE: | CASE NO. |
| RICKY VERLIN MURRAY and<br>CONNIE BROUGHTON MURRAY | 10-10143-8-SWH |
| DEBTORS | |

**ORDER DENYING CONFIRMATION AND GRANTING RELIEF FROM STAY**

A hearing on confirmation of the plan of reorganization filed by the debtors, Ricky and Connie Murray, was held on October 25, October 31, and November 1, 2011, in Raleigh, North Carolina. In addition, on January 9, 2012, the court reopened the hearing on confirmation to consider supplemental evidence and arguments with respect to feasibility. The debtors' arguments in support of confirmation and the objections to it filed by the bankruptcy administrator and by creditor Branch Banking and Trust Company ("BB&T") have been fully briefed. For the reasons that follow, the court concludes that the plan is not feasible as required by 11 U.S.C. § 1129(a)(11) and denies confirmation on that basis.

FACTS AND BACKGROUND

The debtors are members and principals of three North Carolina limited liability companies engaged in the business of owning and renting real estate, as well as a corporation known as Lisa

Dee's Florist, Inc. (collectively, the "Related Entities").[1]  Beginning in 2004 and continuing with additional transactions in 2006 and 2008, the debtors and Related Entities entered into loan agreements with BB&T wherein the debtors and Related Entities executed promissory notes and guaranty agreements in favor of BB&T.  The transactions included the execution of deeds of trust, security agreements, and assignments of rents which granted to BB&T a security interest in real property owned by the Related Entities as well as rents issuing from those properties.  Two of the limited liability companies were administratively dissolved by the North Carolina Secretary of State in February 2009.  The debtors and Related Entities subsequently defaulted on their loan obligations, and in September 2010, BB&T initiated foreclosure proceedings.

On December 1, 2010, the day of the foreclosure sale, the Related Entities transferred to the debtors all of the Related Entities' interests in the real property subject to BB&T's security interests. The debtors filed a petition under chapter 11 on December 10, 2010.  The debtors subsequently and successfully argued that the value of BB&T's collateral would be maximized if they continued in their businesses ventures and that their limited income from other sources (the female debtor's employment and the male debtor's operation of a florist shop) would not provide sufficient cash flow to allow them to continue business operations, such that the use of rents was crucial.  Because continuation of the businesses caused the debtors to incur maintenance and operating expenses, the court, in an order entered on May 24, 2011, allowed the debtors to use cash collateral – *i.e.*, the rents – to pay for operational and other expenses, including management fees to the debtors, insurance,

---

[1] The court's previously entered order of May 24, 2011, allowed the debtors' motion for use of cash collateral and allowed BB&T's request for adequate protection, and also summarized the basic facts of the case and much of its procedural background.  Portions of that summary are repeated here.

supplies, utilities, and taxes. The order also provided that adequate protection payments be made to BB&T.

The debtors filed their Chapter 11 plan and disclosure statement on April 8, 2011, and an amended plan on August 23, 2011. BB&T, the debtors' largest secured creditor, objected to the treatment of both its secured and unsecured claims under the debtors' plan. BB&T argued primarily that the plan lacked feasibility, that its terms were inequitable, and that it did not provide BB&T with the indubitable equivalent of its secured claim. The bankruptcy administrator also objected to confirmation, stating that the debtors were unable to satisfy § 1129(a)(15)(B) with respect to the extent and use of their disposable income over the duration of the plan. BB&T and the bankruptcy administrator set out the particulars of their objections in memoranda that were filed after the confirmation hearing.

On January 4, 2012, the court entered an order determining that it was necessary to reopen the hearing on confirmation of the amended plan with regard to the issue of feasibility in light of the Second Motion to Prohibit or Condition Cash Collateral filed by BB&T on December 12, 2011, and amended on December 30, 2011 (the "Second Cash Collateral Motion"), which alleged post-petition adequate protection payment defaults under the Consent Order Regarding Branch Banking And Trust Company's Expedited Motion To Prohibit Or Condition Use of Cash Collateral Or, In The Alternative, For Adequate Protection Pursuant To 11 U.S.C. § 363(e) entered on October 18, 2011 (the "Adequate Protection Consent Order"). The parties were directed to present, and to be prepared to defend, supplemental testimony on the question of feasibility during a hearing scheduled for January 9, 2012. At the conclusion of that hearing, the court asked the parties to submit joint exhibits setting forth the debtors' actual income and expenses and addressing other feasibility-

related issues, such as the history of past draws made by the debtors from Lisa Dee's, which itself filed a petition under chapter 11 on June 27, 2011. The parties complied with this request and the court has reviewed those exhibits, as well as the last three monthly reports filed by the debtors and by Lisa Dee's, respectively. The court's objective in reopening the hearing and in reviewing these exhibits was to give renewed focus, using the most current and comprehensive information available, to what all concerned can agree is the most obvious, and indeed the threshold, hurdle to confirmation of the debtors' plan: feasibility.

## DISCUSSION

Section 1129(a) sets out the requirements for confirmation of a chapter 11 plan, including the general rule under subsection (a)(8) that all impaired classes must accept the plan. The debtors concede that they cannot satisfy § 1129(a)(8) and thus seek to cram down the plan under § 1129(b). Section 1129(b)(1) provides that the debtor can confirm a plan if all the requirements of § 1129(a) except § 1129(a)(8) are satisfied, so long as the plan does not discriminate unfairly and is fair and equitable to the classes not accepting the plan. In re Bryson Properties, XVIII, 961 F.2d 496, 500 (4th Cir. 1992).

Before proceeding to a cram down analysis, however, the debtors must establish their compliance with every requirement under § 1129(a) *other* than § 1129(a)(8). This of course includes § 1129(a)(11), which establishes as a condition of confirmation that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization

is proposed in the plan." This section provides the feasibility requirement for confirmation. BB&T objects to confirmation on this ground, as well as others.[2]

The debtors acknowledge that they bear the burden of proof to show that the plan is feasible and has a reasonable prospect of success, but emphasize that success "need not be certain or guaranteed." In re Grandfather Mountain Ltd. P'ship, 207 B.R. 475, 487 (Bankr. M.D.N.C. 1996). While a guarantee of success is not required, a debtor must establish a "reasonable assurance" of its ability to successfully carry out the plan that it proposes. See In re Brice Rd. Devs. LLC, 392 B.R. 274, 283 (6th Cir. 2008). This requires more than "[s]incerity, honesty and willingness," because those attributes are "not sufficient to make the plan feasible, and neither are any visionary promises. The test is whether the things which are to be done after confirmation can be done as a practical matter under the facts." In re Bartlett, 92 B.R. 142, 144 (Bankr. E.D.N.C. 1988) (citing Clarkson v. Cook Sales & Serv. Co., 767 F.2d 417, 420 (8th Cir. 1985)).

With that kind of practicality in mind, this court reopened the confirmation hearing in order to give both the debtors and BB&T an additional opportunity to present their best assessments of the feasibility of the plan. By the time of the January 9 hearing, the debtors had a full year of post-petition operations under their belt and had surrendered a significant portion of their real estate, along with its concomitant expense load, pursuant to an agreement to modify the automatic stay made in September of 2011 (the "Relief From Stay Agreement").[3] Unfortunately, the court must

---

[2] As noted above, the bankruptcy administrator objected to the debtors' plan on the basis that it did not comply with 11 U.S.C. § 1129(a)(15). Since the court finds that the plan is not feasible, as required by § 1129(a)(11), it is unnecessary to evaluate the additional objections to confirmation.

[3] The agreement was approved by Order Allowing Joint Motion to Approve Agreement to Modify Automatic Stay Pursuant to Federal Bankruptcy Rule 4001(d) entered on November 3, 2011.

conclude that the updated exhibits and testimony simply reinforce that the debtors, despite their best efforts, have not put forth a feasible plan.

The first indication of the debtors' inability to fund their plan was brought to the court's attention by way of BB&T's Second Cash Collateral Motion which addressed the debtors' payment defaults under the Adequate Protection Consent Order. In essence, the debtors failed to make timely adequate protection payments, although required amounts were substantially less than those which would be required under their plan. The court has had ample opportunity to assess the debtors' character and credibility: they are hard-working and honest. If they could have made those payments in a timely manner, the court is convinced they would have. The debtors had a trial run, and despite their best efforts, they failed.

Furthermore, exhibits and testimony regarding the debtors' projections, coupled with documented recent past performance, compel a similar conclusion. An exhibit prepared by BB&T and introduced in the January 9, 2012 hearing summarizes the rental income and rental expenses of the debtors along with the resulting net rents based on the monthly reports filed by the debtors for the months of January 2011 through November 2011. Ex. 2, January 9, 2012 Hearing. An average monthly rental income, rental expense and net rent is indicated on the exhibit for two periods of time: January-November 2011 and September-November 2011. The latter time period approximates the time frame following the debtors' surrender of certain of their properties to BB&T in accordance with the Relief From Stay Agreement.

Relevant portions of Exhibit 2 illustrate the following:

|                      | Rental Income | Rental Expenses | Net Rents  |
|----------------------|---------------|-----------------|------------|
| Avg/mo (Jan-Nov)     | $13,357.00    | $5,279.79       | $8,077.21  |
| Avg/mo (Sept-Nov)    | $13,429.30    | $4,594.61       | $8,834.69  |

It is noted that the rental expense figures include, among other things, repairs, maintenance, insurance and supplies, but do not include management fees, payments to BB&T, tax payments or reserves for repairs.

To evaluate the effect of the latest available information regarding the debtors' rental operations on these averages, the court reviewed the monthly reports filed by the debtors for the months of December 2011 and January 2012 and, using the same expense categories used in Exhibit 2 above, derived the following:

|  | Rental Income | Rental Expenses | Net Rents |
| --- | --- | --- | --- |
| December 2011 | $13,309.50 | $5,053.16 | $8,256.34 |
| January 2012 | $13,276.90 | $4,729.46 | $8,997.44 |

Expanding the data in Exhibit 2 to include the two most recent months' information, the average rental income from the monthly reports is substantially the same as the number used by the debtors in their plan projections ($13,588.23) for the first year. On the other hand, the debtors project rental expenses of approximately $3800 per month (Exhibit A1), which is much lower than the historical average and approximately $1000 less than the average for the five most recent months.

Even if the court were to accept this lower rental expense figure, which in accordance with the testimony of the male debtor reflects newly implemented cost cutting measures, and if the BB&T plan payments were calculated at the lowest suggested interest rate of 5%,[4] the plan only works if 1) the debtors sell their stock and receive at least $35,690 in proceeds and 2) Lisa Dee's is able to consistently pay them a monthly draw of between $3000-$5000. At the hearing, the debtors represented that the stock would be sold immediately. The court notes, however, that the January

---

[4] The court makes no conclusions as to whether 5% is a fair and equitable interest rate, but uses that rate for illustrative purposes because it is the most favorable to the debtors.

7

monthly report filed by the debtors indicates that the proceeds of stock sales were only $15,135.47, of which $7,000 was transferred to the rental account. It appears that the transfer of those funds was necessary to keep a positive balance in the rental bank account.

The court notes further that the January 2012 monthly report filed by Lisa Dee's indicates a negative bank balance of $5,599.19 in the general operating account. No rent was paid during that month and Part D of the January 2012 monthly report for Lisa Dees's discloses $24,304.46 in accounts payable aged between 61 and 90 days, which includes back rent and taxes owed.[5] In addition, the debtors/owners took a draw of $4,716.03, the draw being a major contributor to the negative balance in the operating account. These facts give the court no comfort that consistent draws from Lisa Dee's will be available to the debtors to fund their plan.

What these figures tell the court is that the financial contingencies upon which debtors base their plan have simply not come to pass. In addition, and more importantly, the financial data available does not support the debtors' projections and hopes, and instead indicates that the debtors' plan cannot reasonably be expected to succeed. Even applying the lowest rate of interest to the debtors' debt to BB&T, and taking the most optimistic view of the debtors' projections, it is readily apparent that the plan is not feasible.

---

[5] The male debtor testified that Lisa Dee's expected to receive approximately $50,000 from FDT in January 2012 from which back rent would be paid. However, despite the receipt of $48,547.39 from the collection of post-petition receivables, no back rent was paid. See January 2012 Monthly Report of Lisa Dee's Florist, Inc.

Because the plan is not feasible as required by § 1129(a)(11), the court has no basis on which to consider the debtors' proposed cram down of BB&T under § 1129(b), and confirmation must be denied.

**SO ORDERED.**

**END OF DOCUMENT**